UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| LAUSTEVEION JOHNSON,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>COVID-19, et al.,<br><br>　　　　　　　Defendants. | Case No. 2:21-cv-02076-RFB-VCF<br><br>**ORDER SCREENING COMPLAINT AND ADDRESSING RELATED APPLICATIONS AND MOTIONS**<br><br>(ECF Nos. 1, 4, 5, 6, 7, 8) |

　　　　Plaintiff Lausteveion Johnson, who is incarcerated in the custody of the Nevada Department of Corrections ("NDOC"), has submitted a civil-rights complaint under 42 U.S.C. § 1983 and filed two applications to proceed <u>in forma pauperis</u> ("IFP"). (ECF Nos. 1-1, 1, 9). Johnson also moves to file a complaint that exceeds the page limits, for the court to take judicial notice of five matters when screening his complaint, on an emergency basis to be released from prison under 18 U.S.C. § 3626, and to supplement that motion with another exhibit. (ECF Nos. 4, 5, 6, 7). The Court denies Johnson's original application for IFP as moot, and it defers ruling on Johnson's second application for IFP until later. The Court now addresses Johnson's pending motions and screens his Complaint under 28 U.S.C. § 1915A.

**I.　　FILING FEE**

　　　　Based on the information in Johnson's original application to proceed IFP, he does not qualify for that status. (<u>See</u> ECF No. 1 at 4). But the Court recognizes that Johnson submitted his application and accompanying documents several months ago, and Johnson recently filed a second application with more current information. The Court therefore denies as moot Johnson's original application to proceed IFP (ECF No. 1) and defers ruling on Johnson's second application (ECF No. 9) until later.

## II. MOTION FOR EXCESS PAGES

Johnson moves for leave to file a complaint that exceeds this district's 30-page limit for such pleadings. (ECF No. 4). But Johnson provides no reason why he needs additional pages to plead his claims. (*Id.*) A review of the Complaint shows that Johnson can plead his claims in 30 pages. For example, Johnson uses over 11 pages to list the defendants he names in this case. (ECF No. 1-1 at 2–13). But he could have listed all of them and their necessary details on a single page. (Compare id. at 2 (listing all defendants and their job titles on a single page), with id. at 3 (repeating all defendants and their job titles on 10 pages). Further, Plaintiff doesn't need to list all of them because he does not plead any facts to connect most of them to the alleged constitutional violations. As a result, the Court denies Johnson's motion for excess pages and dismisses the Complaint without prejudice in its entirety for failure to conform to the proper format. The Court nonetheless screens the Complaint to provide Johnson guidance in pleading his claims if he chooses to file an amended complaint.

## III. MOTION FOR JUDICIAL NOTICE

Johnson moves the Court to take judicial notice of five matters when screening his Complaint. (ECF No. 5). He points out that under Federal Rule of Evidence 201, courts can take judicial notice of an adjudicative fact "that is not subject to reasonable dispute because it is: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." (Id. at 1 (quoting Fed. R. Evid. 201(b)). District courts can consider adjudicative facts in screening a complaint under 18 U.S.C. § 1915A. Fed. R. Civ. P. 201(d) (providing that the court "may take judicial notice at any stage of the proceeding"); cf. Lee v. City of Los Angeles, 250 F.3d 668, 688–89 (9th Cir. 2001) (internal quotation omitted) (providing that in ruling on a Rule 12(b)(6) motion to dismiss, "a court may take judicial notice of matters of public record" under FRE 201). The party moving the court to take judicial notice of a matter bears the burden of "supply[ing] [the court] with the necessary information" to do so. Fed. R. Evid. 201(c)(2).

/ / /

Johnson asks the Court to take notice of the existence and content of five items: (1) the

2

Centers for Disease Control and Prevention ("CDC") states on its website that people who have had a severe reaction to the flu vaccine are recommended to not get a Coronavirus vaccine; (2) a CDC representative appeared on Good Morning American on June 27, 2021, and stated that COVID-19 positivity rates had increased in Nevada by 36%; (3) Vice President Kamala Harris appeared on Reno, Nevada, Channel 8 at 6:30 p.m. on July 4, 2021, and stated that she was alarmed about Nevada's low vaccination rate; (4) CBS World News reported on July 23, 2021, at 6:00 p.m. that the Federal Emergency Management Agency had been ordered to assist Nevada with COVID-19 mitigation efforts; and (5) Johnson's second positive COVID-19 test. (ECF Nos. 5 at 2–4, 7). The Court begins with the three news reports. "Courts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.'" Von Saher v. Norton Simon Museum of Art at Pasadena, 592 F.3d 954, 960 (9th Cir. 2010). This means that the Court can take judicial notice only of the news reports' existence. However, because Johnson does not provide copies or official transcripts of the reports for the Court to review, so the Court declines to take judicial notice of them for any purpose.

Next the Court considers Johnson's positive COVID-19 test. The Court declines to take judicial notice of Johnson's COVID-19 test because it is not an adjudicative fact that is readily known in this District. What remains is the statement about vaccines and allergies on the CDC's website. The Ninth Circuit explained in Daniels-Hall v. Nat. Educ. Ass'n that "[i]t is appropriate to take judicial notice of information . . . [that is] made publicly available by government entities[,] . . . and neither party disputes the authenticity of the websites or the accuracy of the information displayed therein." 629 F.3d 992, 998–99 (9th Cir. 2010). But Johnson does not provide a copy of the webpage that he is referring to or its URL, so the Court declines to take judicial notice of that matter for any purpose. The Court therefore denies Johnson's motions for judicial notice in their entirety.

/ / /

## IV.    SCREENING STANDARD

Federal courts must conduct a preliminary screening in any case in which an incarcerated person seeks redress from a governmental entity or officer or employee of a governmental entity.

See 28 U.S.C. § 1915A(a). In its review, the Court must identify any cognizable claims and dismiss any claims that are frivolous, malicious, fail to state a claim upon which relief may be granted, or seek monetary relief from a defendant who is immune from such relief. See id. §§ 1915A(b)(1), (2). Pro se pleadings, however, must be liberally construed. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential elements: (1) the violation of a right secured by the Constitution or laws of the United States; and (2) that the alleged violation was committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988).

In addition to the screening requirements under § 1915A, under the Prison Litigation Reform Act ("PLRA"), a federal court must dismiss an incarcerated person's claim if "the allegation of poverty is untrue" or if the action "is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2). Dismissal of a complaint for failure to state a claim upon which relief can be granted is provided for in Federal Rule of Civil Procedure 12(b)(6), and the Court applies the same standard under § 1915 when reviewing the adequacy of a complaint or an amended complaint. When a court dismisses a complaint under § 1915(e), the plaintiff should be given leave to amend the complaint with directions as to curing its deficiencies, unless it is clear from the face of the complaint that the deficiencies could not be cured by amendment. Cato v. United States, 70 F.3d 1103, 1106 (9th Cir. 1995).

Review under Rule 12(b)(6) is essentially a ruling on a question of law. See Chappel v. Lab. Corp. of Am., 232 F.3d 719, 723 (9th Cir. 2000). Dismissal for failure to state a claim is proper only if it the plaintiff clearly cannot prove any set of facts in support of the claim that would entitle him or her to relief. Id. at 723–24. In making this determination, the Court takes as true all allegations of material fact stated in the complaint, and the Court construes them in the light most favorable to the plaintiff. Warshaw v. Xoma Corp., 74 F.3d 955, 957 (9th Cir. 1996). Allegations of a pro se complainant are held to less stringent standards than formal pleadings drafted by lawyers. Hughes v. Rowe, 449 U.S. 5, 9 (1980). While the standard under Rule 12(b)(6) does not require detailed factual allegations, a plaintiff must provide more than mere labels and conclusions.

4

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A formulaic recitation of the elements of a cause of action is insufficient. Id.

Additionally, a reviewing court should "begin by identifying [allegations] that, because they are no more than mere conclusions, are not entitled to the assumption of truth." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported with factual allegations." Id. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Id. "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

Finally, all or part of a complaint filed by an incarcerated person may be dismissed sua sponte if that person's claims lack an arguable basis either in law or in fact. This includes claims based on legal conclusions that are untenable—like claims against defendants who are immune from suit or claims of infringement of a legal interest that clearly does not exist—as well as claims based on fanciful factual allegations like fantastic or delusional scenarios. Neitzke v. Williams, 490 U.S. 319, 327–28 (1989).

**V.  SCREENING OF COMPLAINT**

    **A.  Factual allegations**

In his Complaint, Johnson sues at least 47 Defendants for events that took place while he was incarcerated at Southern Desert Correctional Center ("SDCC"), Lovelock Correctional Center ("LCC"), and Warm Springs Correctional Center ("WSCC"). (ECF No.

/ / /

1-1 at 1). Johnson brings three claims and seeks declaratory, injunctive, and compensatory relief. (Id. at 28–38).

Johnson alleges that he suffers from sinus infections, hypertension, and severe allergies. (Id. at 16). These conditions make him vulnerable to serious effects from COVID-19. (Id.) Johnson was transferred to SDCC for a civil trial in January 2020. (Id. at 14). During the trial, Johnson was housed in a single-occupancy cell. (Id. at 15). After the trial Johnson begged to be allowed to stay

in that cell because he was more protected from COVID-19 there. (Id. at 15–16). Eight Defendants—Associate Warden James Scally; Caseworkers McCoy, G. Hernandez, and Cromwell; Warden William Hutchings; NDOC Director Charles Daniels; and Correctional Officers K. Gonzalez, and L. Martinez—told Johnson on October 20, 2020, and again on November 11, 2020, that they were "rejecting" his request "because [he] filed grievances and lawsuits and would find a reason to file grievances and a lawsuit if he remained in unit 2 as a porter." (Id. at 16).

From November 3 to December 6, 2020, Johnson "submitted kites, motions, and grievances to be transferred immediately back to LCC now that his trial was concluded, so that he'd be more/better protected from COVID-19." (Id. at 16). Fourteen Defendants, including Deputy Attorney General Katlyn Brady; Caseworkers Rashunda Smith, Cromwell, McCoy, and G. Hernandez; Correctional Officers Julio Mesa, Douglas Thrasher, Christopher Harris, and Timothy Knatz; Attorney General Aaron Ford; Warden William Hutchings; NDOC Director Charles Daniels; and Associate Wardens James Scally and Monique Hubbard-Pickett denied his requests. (Id. at 16–17).

Johnson was transferred to the dorm housing unit at SDCC on November 12, 2020. (Id. at 17). That unit has enough beds to house 120 prisoners and usually operates at full capacity. (Id.) Based on how the unit is arranged, it was impossible for Johnson to socially distance from his neighbors, whose beds were within inches from him on one side and no more than four feet on another side. (Id.)

A COVID-19 outbreak happened at SDCC in October 2020 starting with the culinary workers. (Id. at 17). There was no hot water in the culinary hall for the workers to use to wash their hands or equipment. (Id.) From November 12 to December 4, 2020, Johnson overheard Hutchings, Hubbard-Pickett, and Scally talking about how they had attended "countless and continuous meetings on how to respond to COVID-19 since February of 2020." (Id. at 18). Johnson asked why, then, hadn't anyone implemented any safety-protocols to protect him from the virus. (Id.) Hubbard-Pickett responded that she "didn't know what to do." (Id.)

Johnson also overheard Defendants Daniels, Williams, Hutchings, McCoy, Cromwell,

6

Hubbard-Pickett, Brady, Scally, the Offender Management Division, Smith, and Caseworker Ragina Barrett state that between November and December 2020 they started placing inmates who tested positive for COVID-19, or had been exposed to it, in Johnson's housing unit. (Id.) Scally confirmed to Johnson and others in his housing unit that this occurred, and that he also instructed medical staff not to give prisoners their COVID-19 test results. (Id. at 19). Johnson suspects that Scally withheld prisoners' test results so prison staff would not have to quarantine or treat any infected prisoners. (Id.) But the prisoners protested this practice and eventually got their test results when Hutchings intervened. (Id.)

Johnson contracted COVID-19 around December 7, 2020. (Id.) He became severely ill and had numerous symptoms: cloudy mind, memory loss, drowsiness, vomiting, extreme chest pain, extreme back pain, constant feelings of dying and almost drowning, mental and physical fatigue, severe dry cough, runny nose, urinating on himself, body shakes, loss of taste and smell, excessive sneezing, and shortness of breath. (Id. at 20). After his initial infection passed, Johnson continued to feel the effects of COVID-19. (Id.) Symptoms he still experiences include cloudy and blank mind, memory loss, drowsiness, back pain, constant feeling of almost drowning, mental and physical fatigue, severe dry cough, urinating on himself, testicle pain, shallow and shortness of breath, coughing up blood, itchy and dry eyes and throat, anxiety, depression, and mental and emotional injuries. (Id.)

///

Johnson submitted a medical kite on May 8, 2021, complaining that he had long COVID-19 symptoms and asked for a compassionate release. (Id. at 22). The Doe Defendant who responded stated that Johnson was not qualified for compassionate release because he was sentenced to "life without the possibility of parole." (Id.) The responder was wrong about the nature of the sentence that Johnson is serving. (Id.)

In July 2021, the NDOC issued a mask mandate that applied to all employees at LCC. (Id. at 23). Days later, Johnson asked Defendant Correctional Officer A. Villareal to put his mask on. (*Id.*) Villareal refused to do so, saying he didn't have to wear one "because he's in the upper bubble." (*Id.* at 23–24).

When Johnson tried to eat in his cell on July 30, 2020, Villareal and Correctional Officer E. Etchenberry told Johnson that he had to eat in the culinary hall. (Id. at 24). Johnson refused to do so because he believed that it was a criminal offense for him to remove his mask in a restaurant-like place. (Id.) Multiple officers were needed to restrain and remove Johnson to administration where he was informed that he needed to eat in the culinary hall and obviously remove his mask to do so despite Nevada's mask mandate. (Id. at 24–25). When Johnson went to the culinary hall the next day, Etchenberry pointed his Taser at Johnson, taunted and threatened him, and asked if they would have problems with Johnson eating like yesterday. (Id. at 25).

The Court notes that Johnson's allegations could be construed as alleging a claim for First Amendment retaliation and conspiracy to violate civil rights. But the Court is aware that Johnson filed another lawsuit in this District based on identical facts and in which he asserts those claims. Johnson, No. 2:21-cv-02151-GMN-VCF, at ECF No. 1-1. And, Johnson is cautioned, duplicative litigation by a plaintiff proceeding IFP may be dismissed as malicious under 28 U.S.C. § 1915(e). See Cato v. United States, 70 F.3d 1103, 1105 n.2 (9th Cir. 1995) (citing Bailey v. Johnson, 846 F.2d 1019, 1021 (5th Cir.1988) (holding that repetitious litigation of virtually identical causes of action is subject to dismissal as malicious)); Pittman v. Moore, 980 F.2d 994, 994-95 (5th Cir.1993) (holding that it is malicious for a "pauper" to file a lawsuit that duplicates allegations of another pending federal lawsuit by the same plaintiff). Because Johnson is pursuing claims in another lawsuit for First Amendment retaliation and conspiracy to violate civil rights arising out of the facts alleged in this case, the Court disregards the allegations about those claims here.

Based on the remaining allegations, Johnson contends that Defendants were deliberately indifferent to his serious medical needs. The Court liberally construes the Complaint as bringing claims based on four different theories of liability: (1) deliberate indifference to serious medical needs, (2) deliberate indifference to unsafe prison conditions by failing to implement COVID-19 safety protocols, (3) supervisory liability for deliberate indifference to unsafe prison conditions, and (4) municipal liability for unsafe prison conditions. The Court will address each theory and any other issues in turn.

### B. Johnson names several defendants he can't sue

Johnson names many Defendants that are not amenable to suit in federal court. Johnson sues COVID-19, which is shorthand for coronavirus disease 2019, the disease caused by the SARS-CoV-2 virus; the Board of Prison Commissioners; the Board of Parole Commissioners; the Nevada Attorney General's Office; the Offender Management Division ("OMD"); Nevada Attorney General Aaron Ford; Nevada Deputy Attorney General Katlyn Brady; Nevada Governor Steve Sisolak; and Nevada Secretary of State Barbara Cegavske.

Viruses and diseases are not persons or entities that can be sued under § 1983. A public agency also is not subject to suit under § 1983 unless it is a separate legal entity. Hervey v. Estes, 65 F.3d 784, 791–92 (9th Cir. 1995). Under Federal Civil Procedure Rule 17(b), the Ninth Circuit has held that state law determines if a department of a municipality may sue or be sued. See, e.g., Streit v. Cnty. of Los Angeles, 236 F.3d 552, 565 (9th Cir. 2001). In Nevada, each city and county are political subdivisions of the state and independent legal entities, which means that each city and county can sue or be sued. Clark Cnty. v. Lewis, 498 P.2d 363, 365 (Nev. 1972); Nev. Rev. Stat. § 41.031(2). But the OMD, Prison Board, Parole Board, and the Office of the Attorney General are arms of the state and thus immune from suit in federal court under the Eleventh Amendment. See, e.g., Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (explaining that the NDOC is a state agency and immune from suit under the Eleventh Amendment). Ford, Brady, Sisolak, and Cegavske are also immune from suit for damages in their official capacities. See Romano v. Bible, 169 F.3d 1182, 1185 (9th Cir. 1999) (explaining that the Eleventh Amendment also bars suits for damages against state agency officials in their official capacity because those actions "are in reality suits against the state itself"). Johnson does not seek injunctive relief that Ford, Brady, or Cegavske could implement. (ECF No. 1-1 at 38 (praying for an injunction "to implement appropriate medical measures and prevent disease")). The Court therefore dismisses the following Defendants from the Complaint with prejudice because amendment would be futile: COVID-19; the OMD; the Board of Prison Commissioners; the Board of Parole Commissioners; the Nevada Attorney General's Office; and Ford, Brady, and Cegavske in their official capacities.

### C. Eighth Amendment deliberate medical indifference

The Eighth Amendment prohibits the imposition of cruel and unusual punishment and "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." Estelle v. Gamble, 429 U.S. 97, 102 (1976) (quotation omitted). A prison official violates the Eighth Amendment when he acts with "deliberate indifference" to the serious medical needs of an inmate. Farmer v. Brennan, 511 U.S. 825, 828 (1994). "To establish an Eighth Amendment violation, a plaintiff must satisfy both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012), overruled on other grounds by Peralta v. Dillard, 744 F.3d 176, 1082–83 (9th Cir. 2014).

To establish the first prong, "the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (quotations omitted). To satisfy the deliberate indifference prong, a plaintiff must show "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." Id. "Indifference may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Id. (quotations omitted).

For the first prong of the Eighth Amendment analysis, Johnson alleges that he has several medical conditions that make him susceptible to serious effects of COVID-19, including hypertension and severe allergies. The Court finds that these allegations are enough for screening purposes to state that Johnson has a serious medical need to be isolated from COVID-19. As a result, the objective prong is satisfied.

As for the subjective prong, Johnson alleges that on two occasions he sought to remain in the single cell where he had been housed during his civil trial. But eight Defendants denied his requests. Johnson thereafter repeatedly sought to be transferred back to LCC where he could be better protected from COVID-19. But 14 Defendants denied his requests.

More than a dozen different Defendants denied Johnson's requests to be transferred or

isolated for medical purposes. But Johnson does not allege that any Defendant was aware of his medical conditions and, thus, his need to be isolated from COVID-19. Johnson has therefore failed to state a colorable claim that any Defendant was deliberately indifferent to his serious medical needs. But it does not yet appear that Johnson cannot state any set of facts upon which relief could be granted. As a result, the Court dismisses the Eighth Amendment deliberate medical indifference claim without prejudice and with leave to amend.

### D.  Eighth Amendment unsafe prison conditions

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. Rhodes v. Chapman, 452 U.S. 337, 349 (1981); Farmer, 511 U.S. at 832. The "treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31 (1993). The Eighth Amendment imposes duties on prison officials to take

reasonable measures to guarantee the safety of inmates and to ensure that inmates receive adequate food, clothing, shelter, and medical care. Farmer, 511 U.S. at 832.

To challenge conditions of confinement under the Eighth Amendment, a plaintiff must meet both an objective and subjective test. Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000). The objective prong requires a "showing that the deprivation was 'sufficiently serious' to form the basis for an Eighth Amendment violation." Id. With respect to the subjective prong of the Eighth Amendment analysis, a prisoner must establish that prison officials were deliberately indifferent to serious threats to the inmate's safety. Farmer, 511 U.S. at 834. To demonstrate that a prison official was deliberately indifferent to a serious threat to the inmate's safety, the prisoner must show that "the official [knew] of and disregard[ed] an excessive risk to inmate . . . safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw the inference." Id. at 837.

Prison officials may not escape liability because they cannot, or did not, identify the specific source of the risk; the serious threat can be one to which all prisoners are exposed. Id. at 843. But "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately

was not averted." Id. at 844; see also Hallinan v. Scarantino, 466 F. Supp. 3d 587, 606 (E.D.N.C. 2020) (finding that the "fact that respondents' response may prove inadequate to prevent the spread of COVID-19 does not establish they were deliberately indifferent").

Johnson alleges facts to show that he caught COVID-19 around December 2020 while he was housed at SDCC. He experienced severe symptoms from his infection and still suffers from the effects of long-term COVID-19. When Johnson caught COVID-19, he was housed in a dormitory-style unit that held 120 prisoners. Prisoners in Johnson's housing unit were unable to socially distance because the beds were closely arranged. There was no mask mandate at SDCC until July 2021. The kitchen lacked hot water for some time, so culinary workers could not sanitize their hands or tools. A COVID-19 outbreak at SDCC started with the culinary workers. And before Johnson was infected, Defendants moved prisoners who had tested positive for COVID-19 into his housing unit.

During this time, SDCC was run by Warden Hutchings and Associate Wardens Hubbard-Pickett and Scally. Scally ordered medical staff not to disclose prisoners' own COVID-19 test results to them. Johnson suspects that Scally did this so the prison wouldn't have to care for or quarantine infected prisoners. This practice ended when the prisoners complained to Hutchings. Johnson alleges that Hutchings, Hubbard-Pickett, and Scally had participated in "countless and continuous meetings on how to respond to COVID-19 since February of 2020." (ECF No. 1-1 at 18). But those Defendants hadn't implemented any COVID-19 safety measures at SDCC by December 2020 when he caught the virus, and didn't until much later. Johnson alleges that Hubbard-Pickett told Johnson that "she didn't know what to do." (Id.)

The Court finds that the allegations are sufficient for screening purposes to state a colorable claim for Eighth Amendment deliberate indifference to unsafe prison conditions against Hutchings, Hubbard-Pickett, and Scally. Because the Court has already dismissed the Complaint in its entirety, it dismisses this clam without prejudice and with leave to amend. If Johnson wants to proceed on this claim, he must file an amended complaint realleging facts to show how Hutchings, Hubbard-Pickett, and Scally failed to reasonably respond to the COVID-19 pandemic.

Johnson also alleges that after a mask mandate was implemented at LCC, Villareal refused

to pull up his mask when Johnson asked him to. The Court does not find that the allegations about Villareal rise to the level of deliberate indifference. Johnson alleges that Villareal was "in the upper bubble" when he declined to pull up his mask and there are no allegations that Villareal was symptomatic or had tested positive for COVID-19. Nor are there allegations that Johnson was exposed to the air that Villareal expelled. Johnson also does not allege that Villareal was aware of his medical conditions.

///

### E. Supervisory liability for unsafe prison conditions

To state a claim that a supervisor is responsible for constitutional violations because he failed to properly train or supervise a subordinate, the plaintiff must plead facts to show that the supervisor's "failure to train [or supervise] amounted to deliberate indifference." Canell v. Lightner, 143 F.3d 1210, 1213 (9th Cir. 1998). To satisfy that requirement, the plaintiff must plead facts showing that "in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policy-makers can reasonably be said to have been deliberately indifferent to the need." Clement v. Gomez, 298 F.3d 898, 905 (9th Cir. 2002) (quoting City of Canton v. Harris, 489 U.S. 378, 390 (1989)). The plaintiff must also show that the inadequate training or supervision was the product "of a 'deliberate' or 'conscious' choice on the part of [the supervisor]." Canell, 143 F.3d at 1214.

Johnson does not plead facts to show that the need for more or different training or supervision was obvious. For example, Johnson does not allege that Governor Sisolak or NDOC Director Charles Daniels were aware that no COVID-19 safety measures had been implemented at SDCC. Johnson also does not plead facts to show that the alleged inadequate training or supervision was the product of a deliberate or conscious choice on the part of any Defendant. Johnson, in fact, pleads facts showing the opposite occurred. According to the allegations, Hutchings, Hubbard-Pickett, and Scally had participated in "countless and continuous meetings on how to respond to COVID-19 since February of 2020." That Hubbard-Pickett told Johnson she "didn't know what to do" does not show that her superiors were aware of her lack of knowledge

1    and consciously chose not to give her further training or supervision.

2    Instead of well-pled factual allegations, Johnson merely concludes that Ford, Brady, and
3    Nevada Governor Steve Sisolak are liable for the unsafe conditions at SDCC during the COVID-
4    19 pandemic because they failed to adequately train and supervise staff members at SDCC and
5    NDOC how to implement safety measures. Johnson likewise concludes that Hutchings, McCoy,
6    Cromwell, Hubbard-Pickett, LCC Warden Tim Garrett, and LCC Associate Wardens John
7    Hensely and Kara Legrand failed to adequately train and supervise staff members at SDCC and
8    LCC how to implement COVID-19 safety measures. And he again concludes that NDOC Medical
9    Director Michael Minev, Medical Administrator Jennifer Bauer, Nevada Secretary of State
10   Barbara Cegavske, Culinary Supervisor Oswald J. Reyes, Resource Officer Christina Leathers,
11   and Policy Administrator Chris Franklin all failed to adequately train and supervise medical staff
12   at SDCC about how to implement COVID-19 safety measures.

13   The Court finds that the allegations are not enough to state a colorable claim for supervisory
14   liability for Eighth Amendment deliberate indifference to unsafe prison conditions against any
15   Defendant. The Court therefore dismisses this claim without prejudice.

16   **F.    Municipal liability for unsafe prison conditions**

17   A municipality may be found liable under 42 U.S.C. § 1983 only where the municipality
18   itself causes the violation at issue. City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989) (citing
19   Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978)). To state a claim for
20   municipal or county liability, a plaintiff must allege that he suffered a constitutional deprivation
21   that was the product of a policy or custom of the local government unit. City of Canton, 489 U.S.
22   at 385. "Official municipal policy includes the decisions of a government's lawmakers, the acts of
23   its policymaking officials, and practices so persistent and widespread as to practically have the
24   force of law." See Connick v. Thompson, 563 U.S. 51, 61 (2011). Municipalities are not
25   vicariously liable under § 1983 for their employees' actions. Id. at 60.

26   A policy has been defined as "a deliberate choice to follow a course of action . . . made
27   from among various alternatives by the official or officials responsible for establishing final policy
28   with respect to the subject matter in question." Long v. Cnty. of Los Angeles, 442 F.3d 1178, 1185

(9th Cir. 2006) (citing Monell, 436 U.S. at 690); see also Waggy v. Spokane Cnty. Washington, 594 F.3d 707, 713 (9th Cir. 2010). The weight of authority has established that a "policy can be one of action or inaction" within the meaning of Monell. Waggy, 594 F.3d at 713 (citing City of Canton, 489 U.S. at 388). "Both types of claims require that the plaintiff prove a constitutional violation." Id. (citing 42 U.S.C. § 1983).

Based on the allegations, Indian Springs is the city in Clark County, Nevada, where SDCC is located. Johnson concludes that Indian Springs and Clark County have a policy of failing to adequately train staff at SDCC about implementing COVID-19 safety measures. Johnson alleges no facts to support these conclusions. He also fails to allege facts to show that either municipality is responsible for creating a policy or custom about implementing COVID-19 safety measures at state prison (SDCC) that's operated by a state agency (the NDOC). The Court dismisses this claim without prejudice.

**VI.    LEAVE TO AMEND**

To be clear, the Court does not grant Johnson leave to amend in any way that he sees fit. Johnson has leave to amend by alleging additional true facts to show how any Defendant was aware of his medical conditions when he or she refused to isolate Johnson at SDCC or transfer him to LCC. Johnson also has leave to amend by realleging facts to show that Hutchings, Hubbard-Pickett, and Scally failed to reasonably respond to the COVID-19 pandemic. But the Court does not give Johnson leave to assert new claims or add parties.

If Johnson chooses to file an amended complaint, he is advised that an amended complaint replaces the preceding complaint, so the amended complaint must be complete in and of itself. This means that the amended complaint must contain all facts and claims and identify all defendants that Johnson intends to sue. Johnson must file an amended complaint on the Court's approved prisoner-civil rights form, and it must be entitled "First Amended Complaint." Johnson must follow the instructions on the form. He may not exceed the 30-page limit, and he need not and should not allege very many facts in the "nature of the case" section of the form. Rather, in each claim, Johnson must allege enough facts to show what each Defendant did to violate his civil rights. Johnson has **until [30 days from today]** to file an amended complaint. If Johnson fails to

timely file an amended complaint, this case is subject to dismissal for failure to state a claim.

### VII. MOTIONS FOR RELEASE UNDER 18 U.S.C. § 3626 AND TO SUPPLEMENT

Johnson moves under 18 U.S.C. § 3626(a)(3)(A)(i)–(ii) for the Court to either issue an order releasing him from prison or set up a three-judge panel to consider his motion. (ECF No. 6). Johnson also moves to supplement that motion with an exhibit he omitted when he filed it. (ECF No. 8). Section 3626 provides that "[i]n any civil action with respect to prison conditions, no court shall enter a prisoner release order unless" two conditions are satisfied. 18 U.S.C. § 3626(a)(3)(A). First, the court must have "previously entered an order for less intrusive relief that has failed to remedy the deprivation of the Federal right sought to be remedied through the prisoner release order[.]" Id. at § 3626(a)(3)(A)(i). Second, "the defendant has had a reasonable amount of time to comply with the previous court orders." Id. at § 3626(a)(3)(A)(ii).

A prisoner release order is not available in this case because Johnson has not yet pled a colorable claim concerning prison conditions. And he has not sought—nor has the Court granted—an order for less intrusive relief. So the Court denies Johnson's motion to be released from prison in its entirety. And the Court denies as moot Johnson's motion to supplement his prisoner-release motion.

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

**VIII.   CONCLUSION**

It is therefore ordered that Johnson's original application to proceed IFP **(ECF No. 1) is denied as moot**.

It is further ordered that Johnson's second application to proceed IFP **(ECF No. 9) is deferred until later**.

It is further ordered that Johnson's motions for excess pages **(ECF No. 4)**, judicial notice **(ECF Nos. 5, 7)**, and release **(ECF No. 6) are denied**.

It is further ordered that Johnson's motion to supplement **(ECF No. 8) is denied as moot**.

It is further ordered that the Complaint (ECF No. 1-1) is dismissed in its entirety without prejudice.

It is further ordered that:

- The claim for Eighth Amendment deliberate medical indifference **is dismissed without prejudice and with leave to amend**;

- The claim for Eighth Amendment deliberate indifference to unsafe prison conditions **is dismissed without prejudice and with leave to amend against only Hutchings, Hubbard-Pickett, and Scally**. If Johnson wants to proceed on this claim, he must file an amended complaint realleging facts to show that Hutchings, Hubbard-Pickett, and Scally failed to reasonably respond to the COVID-19 pandemic;

- The claim for supervisory liability for Eighth Amendment deliberate indifference to unsafe prison conditions **is dismissed without prejudice**; and

- The claim for municipal liability for Eighth Amendment deliberate indifference to unsafe prison conditions **is dismissed without prejudice**.

It is further ordered that Defendants COVID-19; the OMD; the Board of Prison Commissioners; the Board of Parole Commissioners; the Nevada Attorney General's Office; and Aaron Ford, Katlyn Brady, and Barbara Cegavske in their official capacities **are dismissed from the Complaint with prejudice** because amendment would be futile.

It is further ordered that all other Defendants **are dismissed from the Complaint without**

**prejudice**.

It is further ordered that if Johnson chooses to file an amended complaint curing the deficiencies of his Complaint as outlined in this order, he must use the approved form for filing a § 1983 complaint, write the words "First Amended" above the words "Civil Rights Complaint" in the caption, and file the amended complaint **by [30 days from today]**.

It is further ordered that if Johnson chooses not to file an amended complaint, this action will be subject to dismissal without prejudice for failure to state a claim upon which relief could be granted.

Finally, the Clerk of the Court is directed to:

- **File** the Complaint (ECF No. 1-1); and
- **Send** Johnson a copy of the Complaint (ECF No. 1-1), the approved form for filing a § 1983 complaint, and instructions for the same.

DATED: August 12, 2022

_____
RICHARD F. BOULWARE, III
UNITED STATES DISTRICT JUDGE